**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| IN RE:<br><br>DANIEL CARROLL | :<br>:<br>:<br>:<br>:<br>:<br>: | CHAPTER 7<br><br>Case No. 24-11836-AMC |

|  |  |  |
|---|---|---|
| STREET ROAD PARTNERS LLC,<br>SERIES 3<br><br>Plaintiff,<br><br>v.<br><br>DANIEL CARROLL,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | ADVERSARY NO. _____ |

**COMPLAINT TO DETERMINE DISCHARGEABILITY**
**AND IN OBJECTION TO DISCHARGE**

Creditor, Street Road Partners LLC, Series 3 ("Street Road"), by and through

its undersigned counsel, brings the following claims against debtor, Daniel Carroll

("Carroll"), and states the following in support thereof:

**PARTIES**

1. Street Road is a Delaware limited liability company with a registered address

at 416 E Street Road, Trevose, PA 19053.

2. Carroll is an adult individual residing at 349 Croton Road, Wayne, PA 19087.

**FACTS**

3. In or around 2017, Street Road and Bulldog Real Estate Properties, LLC

formed the Pickle Factory, LLC ("Pickle Factory"), for the purpose of purchasing, rehabbing

and selling real property, including property located at 742 Bainbridge Street, Philadelphia,

PA (the "Property"). A true and correct copy of the Operating Agreement is attached hereto as Exhibit A.

4.   Street Road and Bulldog were 50-50% owners of the Pickle Factory. See Ex. A.

5.   Carroll, as the sole member of Bulldog, took the leadership responsibility for the work to be performed at the Property.

6.   When Property was purchased, Street Road obtained an acquisition/construction loan from lender Dennis Sigovich (who provided the down payment) and Pickle Factory obtained a loan from Spring Garden Lending Group, LLC ("SGL") and underwent a refinance with Port Richmond Savings.

7.   Carroll aggressively pursued Michael Wade ("Mr. Wade"), a member of Street Road, to undertake the purchase of the Property and the arrangement was that Street Road would provide the funding and Carroll would provide all aspects of construction and management of the project.

8.   It is the position of Street Road that Carroll and Bulldog violated their fiduciary duty to Street Road by failing to properly move the project forward and by spending Pickle Factory's funds on other projects owned and/or controlled by Carroll.

9.   Specifically, the Property renovation should have been completed within 6-9 months at most and yet it took over two years to complete and there were still repairs and work that needed to be completed.

10.   Upon information and belief, Carroll personally utilized financial draws to be used in connection with the Property on other projects that he owned.

11.   Upon information and belief, Carroll and Philadelphia Renovations also used inferior finishes in the Property that reduced the final sales price, even though a construction

company that Carroll owned was paid approximately $148,000.00 for renovations to the Property.

12.     Moreover, as a result of the unreasonable delays, money earmarked for the construction was used for extension fees with SGL.

13.     Eventually, the interest reserve was drained and Street Road was forced to use its own funds to pay extension fees and monthly interest.

14.     In addition, there were no funds left in the construction loan from SGL.

15.     Mr. Wade visited the construction site on numerous occasions only to find that no one was working on the project.

16.     Carroll fraudulently agreed to form Pickle Factory and purchase the Property in order to use the funds for the renovation of the Property to fund his other projects, debts and to compensate himself.

17.     Further, Carroll fraudulently induced Street Road to form Pickle Factory and purchase the Property as a way to improperly enrich himself.

18.     With respect to the timing of the sale of the Property, Carroll's legal entanglements with other partners and projects resulted in the sale of the Property being cancelled which resulted in additional carry costs for an additional eleven months.

19.     In connection with the renovation and ownership of the Property, Street Road's capital contributions totaled $206,757.90.

20.     While Carroll originally projected the Property to sell at $1.3 million, the Property was sold three years after construction was unreasonably delayed for only $820,000.00.

21.     Because the project dragged on for such an unreasonable period of time, Street Road incurred significant interest and advanced funds broken down as follows:

      a.     June 28, 2023 post-closing payoff to Dennis Sigovich for $124,232.58 representing 35 and 1/2 months of interest.

      b.      Funds advanced to Port Richmond Savings for an April 28, 2023 refinance in the amount of $35,375.39.

      c.      Interest payments to SGL in the amount of $44,469.00.

22.      Lastly, Street made payments as follows to date:

      a.      April 15, 2024 BIRT taxes of $1,026.00.

      b.      Accounting fees of $4,287.50 paid from March 2022 to April 2024.

      c.      Undetermined costs to dissolve the Pickle Factory.

23.      Based on the above, Street Road have damages of approximately $413,860.87 and seeks payment of these damages from Defendants.

### CLAIM FOR RELIEF

**For a Determination that Carroll's Debt to Street Road
is not Dischargeable Pursuant to 11 U.S.C. § 523(a)(2)**

24.      Street Road incorporates herein by reference the allegations set forth in the above paragraphs of the Complaint as if fully set forth herein at length.

25.      Carroll fraudulently agreed to form Pickle Factory and purchase the Property in order to use the funds for the renovation of the Property to fund his other projects, debts and to compensate himself.

26.      Further, Carroll fraudulently induced Street Road to form Pickle Factory and purchase the Property as a way to improperly enrich himself.

27.      The current debt should not be dischargeable based on the above.

**WHEREFORE**, Street Road seek entry of judgment against Carroll as follows:

(a)      That the Court determine that the debt owed to Street Road by Carroll as a result of his fraudulent conduct is nondischargeable by virtue of the provisions of 11 U.S.C. § 523(a)(2).

(b) An award of attorneys' fees as allowable by law in an amount that the Court determines to be reasonable;

(c)      For costs of suit incurred herein; and

(d)      For such other and further relief as this Court deems just and proper.


By: /s/Joseph B. Silverstein
Joseph B. Silverstein

Dated: September 5, 2024

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph B. Silverstein, do hereby certify that on this date, a true and correct copy of the foregoing Complaint to Determine Dischargeability and In Objection to Discharge was served was served via electronic filing on all counsel of record.


/s/Joseph B. Silverstein
Joseph B. Silverstein


Dated: September 5, 2024

# EXHIBIT A

THE LIMITED LIABILITY COMPANY
INTERESTS DESCRIBED HEREIN HAVE
NOT BEEN REGISTERED UNDER THE
SECURITIES ACT OF 1933, AS AMENDED,
OR UNDER THE SECURITIES ACT OF ANY
STATE OR OTHER JURISDICTION. NO
SALE, OFFER TO SELL, OR OTHER
TRANSFER OF THESE INTERESTS MAY BE
MADE BY A MEMBER UNLESS PURSUANT
TO AN EFFECTIVE REGISTRATION
STATEMENT, OR UNLESS, IN THE
OPINION OF COUNSEL TO THE COMPANY,
THE PROPOSED DISPOSITION FALLS
WITHIN A VALID EXEMPTION FROM OR
IS NOT SUBJECT TO THE REGISTRATION
PROVISIONS OF THOSE ACTS.

PICKLE FACTORY, LLC, Operating Agreement (v)

# OPERATING AGREEMENT
## OF
## PICKLE FACTORY, LLC

THIS OPERATING AGREEMENT (this "AGREEMENT") is made and shall be effective as of the 7th day of March, 2017, by and between: STREET ROAD PARTNERS, LLC, SERIES 3, owned by Michael and Suzanne Wade, and BULLDOG REAL ESTATE PROPERTIES, LLC, owned by Daniel Carroll.

## EXPLANATORY STATEMENT

The parties have agreed to organize and operate a limited liability company in accordance with the provisions of the "Pennsylvania Limited Liability Company Act" and subject to the terms and conditions set forth in this AGREEMENT.

NOW, THEREFORE, for good and valuable consideration, the parties, intending to be legally bound, agree as follows:

## SECTION I
## DEFINED TERMS

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this AGREEMENT; and, throughout this AGREEMENT, those terms shall have the meanings respectively ascribed to them.

"ACT" means the Pennsylvania Limited Liability Company Act as amended from time to time.

"ADJUSTED CAPITAL ACCOUNT DEFICIT" means, with respect to any INTEREST HOLDER, the deficit balance, if any, in the INTEREST HOLDER'S CAPITAL ACCOUNT as of the end of the applicable taxable year.

"ADJUSTED CAPITAL CONTRIBUTIONS" means, as of any day, an INTEREST HOLDER'S total CAPITAL CONTRIBUTIONS less all amounts actually distributed to the INTEREST HOLDER. If any INTEREST is transferred in accordance with the terms of this AGREEMENT, the transferee shall succeed to the ADJUSTED CAPITAL CONTRIBUTIONS of the transferor to the extent the ADJUSTED CAPITAL CONTRIBUTIONS relate to the INTEREST transferred.

- 2 -

"AFFILIATE" means, with respect to any MEMBER, any PERSON: (i) which owns more than 50% of the voting interests in the MEMBER; or (ii) in which the MEMBER owns more than 50% of the voting interests; or (iii) in which more than 50% of the voting interests are owned by a PERSON who has a relationship with the MEMBER described in clause (i) or (ii) above.

"AGREEMENT" means this Operating AGREEMENT, as amended from time to time.

"CAPITAL ACCOUNT" means the account to be maintained by the COMPANY for each INTEREST HOLDER in accordance with the following provisions:

(i) an INTEREST HOLDER'S CAPITAL ACCOUNT shall be credited with the INTEREST HOLDER'S CAPITAL CONTRIBUTIONS, the amount of any COMPANY liabilities assumed by the INTEREST HOLDER (or which are secured by COMPANY property distributed to the INTEREST HOLDER), the INTEREST HOLDER'S allocable share of PROFITS and any item of income or gain specially allocated to the INTEREST HOLDER under the provisions of Section IV;

(ii) an INTEREST HOLDER'S CAPITAL ACCOUNT shall be debited with the amount of money and the fair market value of any COMPANY property distributed to the INTEREST HOLDER, the amount of any liabilities of the INTEREST HOLDER assumed by the COMPANY (or which are secured by property contributed by the INTEREST HOLDER to the COMPANY), the INTEREST HOLDER'S allocable share of LOSSES and any item of expense or loss specially allocated to the INTEREST HOLDER under the provisions of Section IV; and

(iii) If any INTEREST is transferred under this AGREEMENT, the transferee shall succeed to the CAPITAL ACCOUNT of the transferor to the extent the CAPITAL ACCOUNT is attributable to the transferred INTEREST. It is intended that the CAPITAL ACCOUNTS of all INTEREST HOLDERS shall be maintained in compliance with the provisions of this AGREEMENT relating to the maintenance of CAPITAL ACCOUNTS.

"CAPITAL CONTRIBUTION" means the total amount of cash and the fair market value of any other assets contributed to the COMPANY by an INTEREST HOLDER, net of liabilities assumed or to which the assets are subject.

"CAPITAL TRANSACTION" means any transaction not in the ordinary course of business which results in the COMPANY'S receipt of cash or other consideration other than CAPITAL CONTRIBUTIONS, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, and insurance proceeds for the destruction of assets used in the trade or business of the COMPANY.

"CASH FLOW" means all cash funds derived from operations of the COMPANY (including interest received on reserves), less cash funds used to pay current operating expenses and

– 3 –

to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, contingencies, and replacements as determined by the MEMBERS. CASH FLOW shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established. CASH FLOW shall not be reduced by noncash charges, including without limitation, depreciation, and amortization.

"CODE" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"COMPANY" means the limited liability company formed in accordance with this AGREEMENT.

"INTEREST" means an INTEREST HOLDER'S share of the PROFITS and LOSSES of, and the right to receive distributions from, the COMPANY.

"INTEREST HOLDER" means any PERSON who holds an INTEREST, whether as a MEMBER or an admitted assignee of a MEMBER.

"INVOLUNTARY WITHDRAWAL" means, with respect to any MEMBER, the occurrence of any of the following events:

(i)    the MEMBER makes an assignment for the benefit of creditors;

(ii)    the MEMBER files a voluntary petition in bankruptcy;

(iii)    the MEMBER is adjudged bankrupt or insolvent or there is entered against the MEMBER an order for relief in any bankruptcy or insolvency proceeding;

(iv)    the MEMBER files a petition seeking for the MEMBER any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v)    the MEMBER files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the MEMBER in any proceeding described in Subsections (i) through (iv);

(vi)    the MEMBER seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the MEMBER or of all or any substantial part of the MEMBER'S properties;

(vii)    any proceeding instituted against the MEMBER seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, which continues for one hundred twenty (120) days after the commencement

–  4  –

thereof, or the appointment of a trustee, receiver, or liquidator for the MEMBER of all or any substantial part of the MEMBER'S properties without the MEMBER'S agreement or acquiescence, which appointment is not vacated or stayed for ninety (90) days or, if the appointment is stayed for ninety (90) days, after the expiration of the stay during which period the appointment is not vacated;

(viii) if the MEMBER is acting as a MEMBER by virtue of being a trustee of a trust, the termination of the trust;

(ix) if the MEMBER is a partnership or limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(x) if the MEMBER is a corporation, the dissolution of the corporation or the revocation of its certificate of incorporation;

(xi) if the MEMBER is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company; or

(xii) if the MEMBER fails to make a CAPITAL CONTRIBUTION when due.

"MEMBER" means each PERSON signing this AGREEMENT and any PERSON who subsequently is admitted as a MEMBER of the COMPANY.

"MEMBERSHIP RIGHTS" means all of the rights of a MEMBER in the COMPANY, including a MEMBER'S: (i) INTEREST; (ii) right to inspect the Company's books and records; and (iii) right to participate in the management of and vote on matters coming before the COMPANY.

"NEGATIVE CAPITAL ACCOUNT" means a CAPITAL ACCOUNT with a balance of less than zero.

"NET CAPITAL PROCEEDS" means the net cash proceeds received by the COMPANY from a CAPITAL TRANSACTION, less any portion thereof used to establish reserves for COMPANY expenses, obligations, and contingencies as determined by the MEMBERS. Net Capital Proceeds shall include all principal and interest payments on any debt obligation received by the COMPANY in any CAPITAL TRANSACTION.

"PERCENTAGE" means, as to a MEMBER, the PERCENTAGE set forth after the MEMBER'S name on Exhibit "A" attached hereto and as to an INTEREST HOLDER who is not a MEMBER, the PERCENTAGE of the MEMBER whose INTEREST has been acquired by such INTEREST HOLDER, to the extent the INTEREST HOLDER has succeeded to that MEMBER'S INTEREST.

"PERSON" means and includes any individual, corporation, partnership, association, Limited Liability Company, trust, estate, or other entity.

"<u>POSITIVE CAPITAL ACCOUNT</u>" means a CAPITAL ACCOUNT with a balance greater than zero.

"<u>PROFITS</u>" and "<u>LOSSES</u>" means, for each taxable year of the COMPANY (or other period for which PROFITS or LOSSES must be computed) the COMPANY'S taxable income or loss determined in accordance with CODE Section 703(a), with the following adjustments:

       (i)  all items of income, gain, loss, deduction, or credit required to be stated separately under CODE Section 703(a)(1) shall be included in computing taxable income or loss; and

       (ii)  any tax-exempt income of the COMPANY, not otherwise taken into account in computing PROFITS or LOSSES, shall be included in computing taxable income or loss; and

       (iii)  any expenditures of the COMPANY described in CODE Section 705(a)(2)(B) or treated as such under Regulation Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing PROFITS or LOSSES, shall be subtracted from taxable income or loss; and

       (iv)  gain or loss resulting from any taxable disposition of COMPANY property shall be computed by reference to the adjusted book value of the property disposed of, determined in accordance with Regulation Section 1.704-1(b)(2)(iv)(d) through (h), notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

       (v)  in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset.

"<u>REGULATIONS</u>" means the income tax REGULATIONS, including any temporary REGULATIONS, from time to time promulgated under the CODE.

"<u>TRANSFER</u>" means, when used as a noun, any voluntary sale, assignment, attachment, or other relinquishment, and, when used as a verb, means, voluntarily to sell, assign, or otherwise relinquish. A pledge, hypothecation, or grant of a security interest, lien, or other encumbrance or the voluntary act of doing any of the foregoing does not constitute a TRANSFER.

### SECTION II
### FORMATION AND NAME; OFFICE; PURPOSE; TERM

2.1. <u>Organization</u>. The parties acknowledge that they have organized a limited liability company pursuant to the ACT and the provisions of this AGREEMENT and, for that purpose, have caused a Certificate of Formation to be executed and filed for record with the Secretary of State.

2.2. <u>Name of the COMPANY</u>. The name of the COMPANY shall be "PICKLE FACTORY, LLC". The COMPANY may do business under that name and under any other name or names upon which the MEMBERS select. If the COMPANY does business under a name other than that set forth in its Certificate of Formation, then the COMPANY shall file a certificate of registration of fictitious name as required by the ACT.

2.3. <u>Purpose</u>. The COMPANY is organized to engage in any lawful business purpose or activity, including but not limited to engaging in the business of owning and operating real estate, and to do any and all things necessary, convenient, or incidental to those purposes.

2.4. <u>Term</u>. The term of the COMPANY shall have begun upon the filing of the Certificate of Formation with the Secretary of State and shall continue in perpetuity or unless its existence is terminated sooner pursuant to this AGREEMENT.

2.5. <u>Registered Office</u>. The registered office of the COMPANY in the Commonwealth of Pennsylvania shall be located at 416 E. Street Road, Feasterville, PA 19053, or at such other location as the parties shall determine in compliance with the ACT.

2.6. <u>Resident Agent</u>. The name and address of the COMPANY'S resident agent in the State of Pennsylvania shall be STREET ROAD PARTNERS, LLC, SERIES 3 , 416 E. Street Road, Feasterville, PA 19053.

2.7. <u>MEMBERS</u>. The name and PERCENTAGE of each MEMBER are set forth on <u>Exhibit "A"</u> attached hereto.

SECTION III
MEMBERS; CAPITAL; CAPITAL ACCOUNTS

3.1. <u>Initial Capital Contributions</u>. Upon the execution of this AGREEMENT and the filing of the Certificate of Formation, the MEMBERS shall contribute to the COMPANY cash in the amounts agreed upon by the MEMBERS.

3.2. <u>Additional Capital Contributions</u>.

A. If the MEMBERS at any time or from time to time determine that the COMPANY requires additional Capital Contributions, then the MEMBERS shall give notice to each MEMBER of (i) the total amount of additional Capital Contributions required, (ii) the reason the additional Capital Contribution is required, (iii) each MEMBER'S proportionate share of the total additional CAPITAL CONTRIBUTION (determined in accordance with this Section), and (iv) the

— 7 —

date each MEMBER'S additional Capital Contribution is due and payable, which date shall be thirty (30) days after the notice has been given. A MEMBER'S proportionate share of the total additional CAPITAL CONTRIBUTIONS shall be equal to the product obtained by multiplying the MEMBER'S PERCENTAGE and the total additional CAPITAL CONTRIBUTIONS required.

B.  Each MEMBER shall be required to contribute additional capital to the COMPANY as set forth herein, however, no MEMBER shall have any personal liability for any obligation of the COMPANY.

3.3.  No Interest on CAPITAL CONTRIBUTIONS.  INTEREST HOLDERS shall not be paid interest on their CAPITAL CONTRIBUTIONS.

3.4.  Return of CAPITAL CONTRIBUTIONS.  Except as otherwise provided in this AGREEMENT, no INTEREST HOLDER shall have the right to receive any return of any CAPITAL CONTRIBUTION.

3.5.  Form of Distribution.  If an INTEREST HOLDER is entitled to receive a return of a CAPITAL CONTRIBUTION or any other distribution, the COMPANY, at the discretion of the MEMBERS, may distribute cash, notes, property, or a combination thereof to the INTEREST HOLDER.

3.6.  CAPITAL ACCOUNTS.  A separate CAPITAL ACCOUNT shall be maintained for each INTEREST HOLDER, in accordance with CODE Section 704(b) and Treas. Reg. §1.704-1(b).

3.7.  Loans.  Any MEMBER may, at any time, make or cause a loan to be made to the COMPANY in any amount and on those terms upon which the COMPANY and the MEMBER agree.

### SECTION IV
### PROFIT, LOSS, AND DISTRIBUTIONS

4.1.  Distribution of CASH FLOW.  CASH FLOW for each taxable year of the COMPANY shall be distributed to the INTEREST HOLDERS in accordance with their PERCENTAGES within seventy-five (75) days after the end of the taxable year.

4.2.  Distribution of Capital Proceeds and Allocation of Profit or Loss from CAPITAL TRANSACTIONS.

A.  PROFITS.  PROFITS shall be allocated to the INTEREST HOLDERS in accordance with their PERCENTAGE INTERESTS.

B.  LOSSES.  LOSSES shall be allocated to the INTEREST HOLDERS in accordance with their PERCENTAGE INTERESTS; provided, however, that no INTEREST

- 8 -

HOLDER shall be allocated a Loss that creates or increases an ADJUSTED CAPITAL ACCOUNT DEFICIT for such INTEREST HOLDER.

    C. NET CAPITAL PROCEEDS. NET CAPITAL PROCEEDS shall be distributed and applied by the COMPANY in the following order and priority:

    (1). to the payment of debts and liabilities of the COMPANY then due and outstanding (including all debts due to any INTEREST HOLDER); then

    (2). the balance shall be distributed as follows:

    (a). to the INTEREST HOLDERS in proportion to their ADJUSTED CAPITAL CONTRIBUTIONS, until their remaining ADJUSTED CAPITAL CONTRIBUTIONS have been paid in full;

    (b). the balance, to the INTEREST HOLDERS in accordance with their PERCENTAGES.

    4.3. Liquidation and Dissolution.

    A. If the COMPANY is liquidated, the assets of the COMPANY shall be distributed to the INTEREST HOLDERS in proportion to their PERCENTAGE INTERESTS as set forth in Exhibit "A" attached hereto, taking into account the allocations of PROFITS or LOSSES, if any, and distributions, if any, of cash or property.

    B. No INTEREST HOLDER shall be obligated to restore a NEGATIVE CAPITAL ACCOUNT.

    4.4. General.

    A. Except as otherwise provided in this AGREEMENT, the timing and amount of all distributions shall be determined by the MEMBERS.

    B. If any assets of the COMPANY are distributed in kind to the INTEREST HOLDERS, those assets shall be valued at their fair market value, and any INTEREST HOLDER entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other INTEREST HOLDERS so entitled. Unless the MEMBERS otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the MEMBERS. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided herein and shall be properly credited or charged to the CAPITAL ACCOUNTS of the INTEREST HOLDERS prior to the distribution of the assets.

C. All PROFITS and LOSSES shall be allocated, and all distributions shall be made to the PERSONS shown on the records of the COMPANY to have been INTEREST HOLDERS as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the COMPANY'S taxable year is otherwise separated into two or more short years, if there is a TRANSFER or an INVOLUNTARY WITHDRAWAL during the taxable year, the PROFITS and LOSSES shall be allocated between the original INTEREST HOLDER and the successor on the basis of the number of days each was an INTEREST HOLDER during the taxable year. In addition, the COMPANY'S taxable year shall be separated into two or more short years to account for PROFITS, LOSSES, or proceeds attributable to a CAPITAL TRANSACTION or to any other extraordinary non-recurring items of the COMPANY.

D. The MEMBERS are hereby authorized, upon the advice of the COMPANY'S tax counsel, to amend this Article to comply with the CODE and the REGULATIONS promulgated under CODE Section 704(b); provided, however, that no amendment shall materially affect distributions to an INTEREST HOLDER without the INTEREST HOLDER'S prior written consent.

## SECTION V
## MANAGEMENT: RIGHTS, POWERS, AND DUTIES

5.1. Management.

A. MEMBERS. The COMPANY shall be managed by the majority decision of the MEMBERS.

B. General Powers. The MEMBERS shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this AGREEMENT and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the COMPANY for the purposes herein stated, and to make all decisions affecting such business and affairs.

C. Extraordinary Transactions. Notwithstanding anything to the contrary in this AGREEMENT, the MEMBERS shall not undertake any of the following on behalf of the COMPANY without the approval of all the MEMBERS:

(1). The admission of additional MEMBERS to the COMPANY; or

(2). Entering into a CAPITAL TRANSACTION.

5.2. Meetings of and Voting by MEMBERS.

A. A meeting of the MEMBERS may be called at any time by the MEMBERS or by those MEMBERS holding at least fifty percent (50%) of the PERCENTAGES then held by MEMBERS. Meetings of MEMBERS shall be held at the COMPANY'S principal place of business

- 10 -

or at any other place in Pennsylvania designated by the PERSON calling the meeting. Not less than ten (10) nor more than ninety (90) days before each meeting, the PERSON calling the meeting shall give written notice of the meeting to each MEMBER entitled to vote at the meeting. The notice shall state the time, place, and purpose of the meeting. Notwithstanding the foregoing provisions, each MEMBER who is entitled to notice waives notice if before or after the meeting the MEMBER signs a waiver of the notice which is filed with the records of MEMBERS' meetings, or is present at the meeting in PERSON or by proxy. Unless this AGREEMENT provides otherwise, at a meeting of MEMBERS, the presence in PERSON or by proxy of MEMBERS holding not less than fifty-one percent (51%) of the PERCENTAGES then held by MEMBERS constitutes a quorum. A MEMBER may vote either in PERSON or by written proxy signed by the MEMBER or by his duly authorized attorney in fact.

B.    Except as otherwise provided in this AGREEMENT, wherever this AGREEMENT requires the approval of the MEMBERS, the affirmative vote of MEMBERS holding fifty-one percent (51%) or more of the PERCENTAGES then held by MEMBERS shall be required to approve the matter.

C.    In lieu of holding a meeting, the MEMBERS may vote or otherwise take action by a written instrument indicating the consent of MEMBERS holding a majority of the PERCENTAGES then held by MEMBERS.

D.    Wherever the ACT requires unanimous consent, or the consent of all MEMBERS other than the one who is the subject of an action, in order to approve or take any action, that consent shall be given in writing.

5.3. Personal Services.    No MEMBER shall be required to perform services for the COMPANY solely by virtue of being a MEMBER. Unless approved by the MEMBERS, no MEMBER shall perform services for the COMPANY or be entitled to compensation for services performed for the COMPANY. However, upon substantiation of the amount and purpose thereof, a MEMBER shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the COMPANY.

5.4. Duties of Parties.

A.    Except as otherwise expressly provided herein, nothing in this AGREEMENT shall be deemed to restrict in any way the rights of any MEMBER, or of any AFFILIATE of any MEMBER, to conduct any related or unrelated business or activity whatsoever, and the MEMBER shall not be accountable to the COMPANY or to any MEMBER with respect to that business or activity. The organization of the COMPANY shall be without prejudice to each MEMBER'S respective rights (or the rights of their respective AFFILIATES) to maintain, expand, or diversify such other interests and activities and to receive and enjoy PROFITS or compensation there from. Each MEMBER waives any rights the MEMBER might otherwise have to share or participate in such other interests or activities of any other MEMBER or the MEMBER'S AFFILIATES.

- 11 -

B. Each MEMBER understands and acknowledges that the conduct of the COMPANY'S business may involve business dealings and undertakings with MEMBERS and their AFFILIATES. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

### 5.5. Power of Attorney.

A. Grant of Power. Each MEMBER constitutes and appoints STREET ROAD PARTNERS, LLC, SERIES 3    as the MEMBER'S true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the MEMBER'S name, place, and stead, to make, execute, sign, acknowledge, and file:

(1). a certificate of formation or any amendment thereto;

(2). all such documents or instruments to reflect the admission to the COMPANY of a substituted MEMBER, an additional MEMBER, or the withdrawal of any MEMBER, in the manner prescribed in this AGREEMENT;

(3). all such documents or instruments which he deems necessary, appropriate, or helpful in the ordinary course of the COMPANY'S business;

(4). all documents which the Attorney-in-Fact deems appropriate to reflect any amendment, change, or modification of this AGREEMENT;

(5). any and all other certificates or other instruments required to be filed by the COMPANY under the laws of the Commonwealth of Pennsylvania or of any other state or jurisdiction, including, without limitation, any certificate or other instruments necessary in order for the COMPANY to continue to qualify as a limited liability company under the laws of the Commonwealth of Pennsylvania;

(6). one or more fictitious name certificates; and

(7). all documents which may be required to dissolve and terminate the COMPANY and to cancel its certificate of formation.

B. Irrevocability. The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a MEMBER. It also shall survive the TRANSFER of an INTEREST, except that if the transferee is approved for admission as a MEMBER, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge, and file any documents needed to effectuate the substitution. Each MEMBER shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney,

– 12 –

and each MEMBER hereby waives any and all defenses which may be available to contest, negate, or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

## SECTION VI
## TRANSFER OF INTERESTS AND WITHDRAWALS OF MEMBERS: RESTRICTIONS

### 6.1. TRANSFERS.

A. No MEMBER shall sell, assign, TRANSFER, encumber, or otherwise dispose of any interest in the COMPANY or the assets of the COMPANY without the prior unanimous consent of all the MEMBERS in writing. If a TRANSFER is made in violation of the foregoing, such TRANSFER shall be void and without force or effect. Any attempt by any MEMBER to make a TRANSFER in violation of the foregoing shall constitute a breach of this AGREEMENT. A PERSON may, however, TRANSFER all or any portion of or any interest or rights in the PERSON'S MEMBERSHIP RIGHTS or INTEREST if the following conditions ("Conditions of TRANSFER") are satisfied:

(1). The TRANSFER will not require registration of Interests or MEMBERSHIP RIGHTS under any federal or state securities laws;

(2). The transferee delivers to the COMPANY a written instrument agreeing to be bound by the terms of this AGREEMENT.

(3). The TRANSFER will not result in the termination of the COMPANY pursuant to CODE Section 708;

(4). The TRANSFER will not result in the COMPANY being subject to the Investment Company Act of 1940, as amended;

(5). The transferor or the transferee delivers the following information to the COMPANY: (i) the transferee's taxpayer identification number; and (ii) the transferee's initial tax basis in the transferred INTEREST;

(6). The transferor complies with all other transfer provisions set forth in this AGREEMENT;

(7). The transferor must provide written notice to the remaining MEMBERS at least 30 days prior to any proposed TRANSFER of any such interest or right; and

(8). The transferor must obtain the written consent of all remaining MEMBERS prior to such proposed TRANSFER.

– 13 –

B.  If the Conditions of TRANSFER are satisfied, then a MEMBER or INTEREST HOLDER may TRANSFER all or any portion of that PERSON'S INTEREST only if each such portion of an INTEREST is specifically consented to by the remaining MEMBERS in writing.  The TRANSFER of a partial or component INTEREST shall not result, however, in the TRANSFER of any of the transferor's other MEMBERSHIP RIGHTS, if any, and the transferee of the INTEREST shall have no right to: (i) become a MEMBER; or (ii) exercise any MEMBERSHIP RIGHTS other than those specifically pertaining to the ownership of an INTEREST.

C.  Each MEMBER hereby acknowledges the reasonableness of the Conditions of TRANSFER contained in this Section in view of the purposes of the COMPANY and the relationship of the MEMBERS.  The TRANSFER of any MEMBERSHIP RIGHTS or INTERESTS which do not satisfy the Conditions of TRANSFER contained in this Section shall be deemed invalid, null and void, and of no force or effect.  Any PERSON to whom MEMBERSHIP RIGHTS are attempted to be transferred in violation of this Section shall not be entitled to vote on matters coming before the MEMBERS, participate in the management of the COMPANY, receive distributions from the COMPANY, or have any other rights in or with respect to the MEMBERSHIP RIGHTS.

6.2.  <u>INVOLUNTARY WITHDRAWAL.</u>  If any MEMBER shall INVOLUNTARILY WITHDRAWAL from the COMPANY, that MEMBER'S INTEREST shall be divided amongst the remaining MEMBERS.  This remedy is in addition to any other remedy allowed by law or this AGREEMENT.

SECTION VII
DISSOLUTION, LIQUIDATION, AND
TERMINATION OF THE COMPANY

7.1.  <u>Dissolution.</u>  The COMPANY shall be dissolved upon the unanimous written agreement of all of the MEMBERS.

7.2.  <u>Procedure for Winding Up.</u>  If the COMPANY is dissolved, the MEMBERS shall wind up its affairs.  On winding up of the COMPANY, the assets of the COMPANY shall be distributed as follows:

A.  First, to creditors, including MEMBERS who are creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the COMPANY, other than liabilities for which reasonable provision has been made; and

B.  Second, to INTEREST HOLDERS first, for the return of their Capital Contributions and then, in proportion to their PERCENTAGE Interests as set forth in <u>Exhibit "A"</u> attached hereto.

7.3.   <u>Filing of a Certificate of Cancellation</u>. If the COMPANY is dissolved, the MEMBERS shall promptly file a Certificate of Cancellation with the Secretary of State. If there are no remaining MEMBERS, the Certificate shall be filed by the last PERSON to be a MEMBER.

SECTION VIII
<u>BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS AND EMPLOYMENT OF PROFESSIONAL SERVICES</u>

8.1. <u>Bank Accounts</u>. All funds of the COMPANY shall be deposited in a bank account or accounts opened in the COMPANY'S name. The MEMBERS shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the PERSONS who will have authority with respect to the accounts and the funds therein.

8.2. <u>Books and Records</u>.

A.  The MEMBERS shall keep or cause to be kept complete and accurate books and records of the COMPANY and supporting documentation of the transactions with respect to the conduct of the COMPANY'S business. The records shall include, but not be limited to: (i) complete and accurate information regarding the state of the business and financial condition of the COMPANY; (ii) a copy of the certificate of formation and operating AGREEMENT, all amendments to the certificate of formation and operating AGREEMENT, and all executed copies of any written powers of attorney pursuant to which the operating AGREEMENT, any certificate, and all amendments thereto have been executed; (iii) a current list of the names and last known business, residence, or mailing addresses of all MEMBERS and the dates they became MEMBERS; (iv) the COMPANY'S federal, state, and local tax returns, and (v) true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each MEMBER and which each MEMBER has agreed to contribute in the future.

B.  The books and records shall be maintained in accordance with sound accounting practices and shall be available at the COMPANY'S principal office for examination by any MEMBER or the MEMBER'S duly authorized representative at any and all reasonable times during normal business hours.

C.  Any request for information shall be in writing, and shall state the purpose therefore. Each MEMBER shall reimburse the COMPANY for all costs and expenses incurred by the COMPANY in connection with the MEMBER'S inspection and copying of the COMPANY'S books and records.

8.3. <u>Annual Accounting Period</u>. The annual accounting period of the COMPANY shall be its taxable year. The COMPANY'S taxable year shall be selected by the MEMBERS, subject to the requirements and limitations of the CODE.

— 15 —

8.4. <u>Reports</u>. If requested by any MEMBER, within seventy-five (75) days after the end of each taxable year of the COMPANY, the MEMBERS shall cause to be sent to each PERSON who was a MEMBER at any time during the accounting year then ended: (i) an annual compilation report, prepared by the COMPANY'S independent accountants in accordance with standards issued by the American Institute of Certified Public Accountants; and (ii) a report summarizing the fees and other remuneration paid by the COMPANY to any MEMBER, the MEMBERS, or any Affiliate in respect of the taxable year. In addition, within seventy-five (75) days after the end of each taxable year of the COMPANY, the MEMBERS shall cause to be sent to each PERSON who was an INTEREST HOLDER at any time during the taxable year then ended, that tax information concerning the COMPANY which is necessary for preparing the INTEREST HOLDER'S income tax returns for that year. At the request of any MEMBER, and at the MEMBER'S expense, the MEMBER may cause an audit of the COMPANY'S books and records to be prepared by independent accountants for the period requested by the MEMBER.

8.5. <u>Tax Matters Partner</u>. STREET ROAD PARTNERS, LLC, SERIES 3  shall be the COMPANY'S tax matters partner ("Tax Matters Partner"). The Tax Matters Partner shall have all powers and responsibilities provided in CODE Section 6221, <u>et seq</u>. The Tax Matters Partner shall keep all MEMBERS informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Partner. The COMPANY shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Partner in performing those duties. A MEMBER shall be responsible for any costs incurred by the MEMBER with respect to any tax audit or tax-related administrative or judicial proceeding against any MEMBER, even though it relates to the COMPANY. The Tax Matters Partner shall not compromise any dispute with the Internal Revenue Service without the approval of the MEMBERS.

8.6. <u>Tax Elections</u>. The MEMBERS shall have the authority to make all COMPANY elections permitted under the CODE, including, without limitation, elections of methods of depreciation and elections under CODE Section 754. The decision to make or not make an election shall be at the MEMBERS'S sole and absolute discretion.

SECTION IX
GENERAL PROVISIONS

9.1. <u>Assurances</u>. Each MEMBER shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the MEMBERS deem appropriate to comply with the requirements of law for the formation and operation of the COMPANY and to comply with any laws, rules, and REGULATIONS relating to the acquisition, operation, or holding of the property of the COMPANY. The MEMBERS represent and warrant to each other that the execution of this AGREEMENT, the formation of the COMPANY and the operation of the business to be conducted thereby will not cause a breach or violation of any existing agreement, oral or written, with any third party. Each party to this AGREEMENT agrees to indemnify and hold harmless the other parties hereto from any claims, causes of action, losses or liabilities, (including reasonable reimbursement for attorney's fees and costs) that may arise from any

- 16 -

such party's activities relating to the execution of this AGREEMENT or the formation of the COMPANY.

9.2. <u>Notifications</u>. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this AGREEMENT must be in writing and delivered personally or sent by overnight express mail or certified or registered mail, postage prepaid, return receipt requested. Any notice to be given hereunder by the COMPANY shall be given by the MEMBERS. A notice must be addressed to an INTEREST HOLDER at the INTEREST HOLDER'S last known address on the records of the COMPANY. A notice to the COMPANY must be addressed to the COMPANY'S principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the PERSON to whom it is delivered. A notice that is sent by mail will be deemed given upon receipt by the recipient. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

9.3. <u>Specific Performance</u>. The parties recognize that irreparable injury will result from a breach of any provision of this AGREEMENT and that money damages will be inadequate to remedy fully the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this AGREEMENT, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4. <u>Complete Agreement</u>. This AGREEMENT constitutes the complete and exclusive statement of the agreement among the MEMBERS. It supersedes all prior and contemporaneous written and oral statements, including any prior or contemporaneous representations, statements, conditions, or warrantees. This AGREEMENT may not be amended without the written consent of all of the MEMBERS.

9.5. <u>Controlling Law</u>. This AGREEMENT and all questions relating to its validity, interpretation, performance and enforcement, shall be governed by and construed in accordance with the substantive laws of the Commonwealth of Pennsylvania, notwithstanding any conflict-of-law provisions to the contrary.

9.6. <u>Section Titles</u>. The headings herein are inserted as a matter of convenience only, and do not define or limit the scope of this AGREEMENT or the intent of the provisions hereof.

9.7. <u>Binding Provisions</u>. This AGREEMENT is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

9.8. <u>Terms</u>. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the identity of the person may in the context require.

– 17 –

9.9. <u>Separability of Provisions</u>. Each provision of this AGREEMENT shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this AGREEMENT which are valid.

9.10. <u>Execution in Counterparts</u>. This AGREEMENT may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This AGREEMENT shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signature of all of the parties reflected hereon as the signatories.

9.11. <u>Estoppel Certificate</u>. Each MEMBER shall, within ten (10) days after written request by any MEMBER, deliver to the requesting PERSON a certificate stating, to the MEMBER'S knowledge, that:  (a) this AGREEMENT is in full force and effect; (b) this AGREEMENT has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no default hereunder by the requesting PERSON, or if there is a default, the nature and extent thereof.  If the certificate is not received within that ten (10) day period, the MEMBERS shall execute and deliver the certificate on behalf of the requested MEMBER, without qualification, pursuant to the power of attorney granted herein.

9.12. <u>Conformance of AGREEMENT</u>: The parties acknowledge that it is their intent that the COMPANY be treated as a partnership for purposes of taxation by the Internal Revenue Service, the Commonwealth of Pennsylvania and any other jurisdiction which may require tax filings. To the extent that any provision of this AGREEMENT conflicts with such intent, such conflicting provision or provisions shall be disregarded or interpreted to provide the COMPANY and its MEMBERS with the most beneficial tax treatment in any particular circumstance.

[signature page follows – the remainder of the page is intentionally left blank]

PICKLE FACTORY, LLC, Operating Agreement. v1

**INTENDING TO BE LEGALLY BOUND,** the parties have executed or caused this AGREEMENT to be duly executed as of the date set forth herein above.

MEMBERS:

STREET ROAD PARTNERS, LLC, SERIES 3

BY: _____
      Michael Wade

BY: _____
      Suzanne Wade

BULLDOG REAL ESTATE PROPERTIES, LLC

BY: _____
      Daniel Carroll

– 19 –

PICKLE FACTORY, LLC, Operating Agreement v1

EXHIBIT "A"
PICKLE FACTORY, LLC
OPERATING AGREEMENT
<u>LIST OF MEMBERS AND PERCENTAGES</u>

| <u>NAME</u> | <u>PERCENTAGES</u> |
|---|---|
| STREET ROAD PARTNERS, LLC, SERIES 3 | 50% |
| BULLDOG REAL ESTATE PROPERTIES, LLC | 50% |

PICKLE FACTORY, LLC, Operating Agreement.v1

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph B. Silverstein, do hereby certify that on this date, a true and correct copy of the foregoing Complaint to Determine Dischargeability and In Objection to Discharge was served was served via electronic filing on all counsel of record.

/s/Joseph B. Silverstein_____
Joseph B. Silverstein

Dated: September 5, 2024